# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| JANET DARMO, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14-cv-4827 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| TARGET CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Target Corporation's motion for summary judgment [36]. For the reasons set forth below, Defendant's motion [36] is granted.

## I.  Background[1]

Plaintiff Janet Darmo injured her knee when she slipped and fell in a retail store owned and operated by Defendant Target Corporation. She sued Defendant in the Circuit Court of Cook County, Illinois, and Defendant then removed that lawsuit to federal court, invoking the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332. [See 1.]

The incident in question occurred on Thursday, June 7, 2012, at the Target store in Evanston, Illinois. The spill itself occurred at approximately 2:15 p.m. that day, when an unknown female customer—who can be seen, at least in part, on Target's video surveillance footage—was shopping in the store's Dollar Spot section. The Dollar Spot is a small shopping area composed of two short, perpendicular aisles near the check-out lanes toward the front of the store. Like much of the surrounding area, the Dollar Spot is brightly lit and has a white tile floor.

---

[1] The Court takes the relevant facts from the parties' Local Rule 56.1 statements, construing the facts in the light most favorable to the nonmoving party.

The surveillance video shows the unknown woman lift a cup from a shelf in front of her, move the cup towards her (as if to take a drink), and then drop the cup onto the floor as she attempts to put it back onto the shelf. The camera view is obstructed by a red partition wall that separates the Dollar Spot from the check-out lanes, such that only the woman's upper torso is visible during the brief incident. Thus, when the woman bends down to pick up the cup, she, and the spill itself, are completely hidden by the partition wall. It is undisputed that the spilled substance was water.

Approximately 16 minutes later (again, as depicted in the surveillance footage), Plaintiff slipped and fell on the spilled water. Plaintiff, who shopped at this Target store regularly and often perused the Dollar Spot aisles, had been in the store for approximately 30 minutes at the time of her fall. Plaintiff claims that she did not see the puddle of water before she slipped on it, even though she had walked down both aisles of the Dollar Spot one full time and did not fall until her second lap around those aisles. Plaintiff admits that this Target store was always clean, well-maintained, and brightly lit, including on the day in question. She was carrying a toy figurine, a greeting card, and her wallet at the time of the fall; she did not have a shopping cart or shopping basket.

Less than 30 seconds after the fall, the unknown woman who spilled the water reappeared at the spill location with a Target employee, Muhamed Terzic, whom she had notified about the spill. Upon seeing the spill, Mr. Terzic immediately notified store management, who blocked off the area, cleaned the spill, and completed a Guest Incident Report documenting the occurrence.

All Target employees receive training on spills and spill clean-ups. Employees undergo an orientation and training program when they are first hired, which includes video training regarding spills and clean-up procedures. Employees also undergo a two-week on-the-job training period where they shadow more-experienced employees and are trained on all aspects of

the job, including safety and customer service. Target employees also engage in periodic daily training sessions or huddles regarding safety, where they are taught to be observant for spills and promptly clean them upon notice, although there are no specific times of the day where Target employees are required to walk each area of the store to inspect for spills. Employees are trained never to leave a spill unattended and to follow the "60-Second Rule," which requires an employee to respond and take action within sixty seconds of learning of a spill. Mr. Terzic testified in his deposition that he was following the 60-Second Rule when he approached the spill location at approximately 2:32 p.m., after having been informed of the spill by the unknown female customer. There is no evidence that any Target employee had notice of the spill prior to the point when the unknown customer relayed this information to Mr. Terzic.

Mr. Terzic testified at his deposition that the Target store was not "particularly crowded" on that Thursday afternoon. He agreed with Plaintiff's statement that, generally speaking, the Dollar Spot area is a "high volume" area, but he qualified by noting that "almost anywhere" in the store can be considered a high-volume area. The surveillance footage shows there were two other customers in the Dollar Spot area when Plaintiff fell, and approximately 22 or 23 individuals walked through the Dollar Spot aisles during the 16-minute interval between the spill and Plaintiff's fall. Plaintiff notes that approximately 12 individuals in red shirts and khaki pants (*i.e.*, the standard uniform of a Target employee) walked past the Dollar Spot area during this interval, but none of those individuals walked down the aisle with the spill. However, the video quality is too poor to determine whether those individuals were Target employees.

The parties dispute the size of the spill: Mr. Terzic indicated the size in his deposition by making a circle with his hands by touching his forefingers together and his thumbs together (Defendant's counsel referred to the circle as four inches in diameter, but Plaintiff's counsel

3

exposed Mr. Terzic's infirmities in estimating units of measurement, both metric and customary). [37-1, at 160, 181.] Plaintiff refrained from estimating the size of the spill in any quantitative measure by "indicating an area that's less than the width of [her] body from arm to arm." [37-1, at 18.] The Guest Incident Report says "water spilled 6' area," [37-1, at 79], and a separate Investigation Report prepared by Target management reports "approx 4' of spilled water." [52-1, at 2.] As mentioned, the spill cannot be seen on the surveillance footage. There is no indication from the video that any of the 22 or 23 customers who walked down the aisle with the spill noticed it or otherwise adjusted their path to avoid it. Neither party produced testimony from any other witnesses who saw the spilled water.

  Finally, regarding the video surveillance footage, Plaintiff deposed Target employee Gildardo Nicholas, who was one of two "protection specialists" (*i.e.*, security camera operators) on duty that day (a woman named Mattea Beach was the other, although she was not deposed or otherwise questioned by the parties in this case). This particular Target has multiple security cameras, including one for each register, and at least some of the cameras can be manipulated manually by the protection specialists to focus on other areas of the store. The camera that captured the spill was typically directed at an area of the store that contained the Dollar Spot aisles as well as the "softlines" merchandise area (clothing and accessories), the electronics area, and two express check-out lanes, but could be manipulated to focus on other areas of the store as well. Mr. Nicholas testified that he had no recollection of whether he was watching the surveillance footage that depicted the spill. He testified affirmatively that he was not the one operating the camera at that time, but also said that there would be no way to determine who was operating the camera, and that it was possible that he "might have been the only one operating

the cameras that day." [37-1, at 113.] Upon viewing the spill on the surveillance tape, Mr. Nicholas confirmed that "it could seem she spilled something." [37-1, at 112.]

## II. Legal Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also *Sallenger v. City of Springfield, Ill.*, 630 F. 3d 499, 503 (7th Cir. 2010) (citing Fed. R. Civ. P. 56(c)(2) and noting that summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law"). In determining whether summary judgment is appropriate, the court should construe all facts and reasonable inferences in the light most favorable to the non-moving party. See *Carter v. City of Milwaukee*, 743 F. 3d 540, 543 (7th Cir. 2014). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Put another way, the moving party may meet its burden by pointing out to the court that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

To avoid summary judgment, the opposing party then must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). For this reason, the Seventh Circuit has called summary judgment the "put up or shut up" moment in a lawsuit—"when a party must show what evidence it has that would convince a trier of fact to accept its version of events." See *Koszola v. Bd. of Educ. of City of Chicago*, 385 F. 3d 1104,

1111 (7th Cir. 2004). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III. Analysis

Plaintiff alleges that Defendant acted negligently by failing to keep its store safe, causing Plaintiff's knee injury. The parties agree that Illinois law supplies the elements that Plaintiff must prove to prevail in this diversity suit. See *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 649 (7th Cir. 2014); *Lane v. Hardee's Food Systems, Inc.*, 184 F.3d 705, 707 (7th Cir. 1999). To recover on a negligence claim under Illinois law, a plaintiff must establish the existence of a duty owed by the defendant, a breach of that duty, and an injury proximately resulting from that breach. *Miller v. Nat'l Ass'n of Realtors*, 648 N.E.2d 98, 100 (Ill. App. Ct. 1994). Regarding the "duty" element, in Illinois, businesses owe their invitees a duty to maintain the premises in a reasonably safe condition to avoid injuring them. *Marshall v. Burger King Corp.*, 856 N.E.2d 1048, 1057–58 (Ill. 2006); see also *Pavlik v. Wal-Mart Stores, Inc.*, 753 N.E.2d 1007, 1063 (Ill. App. Ct. 2001); *Peterson v. Wal-Mart Stores, Inc.*, 241 F.3d 603, 604 (7th Cir. 2001).

The only dispute here is whether Defendant breached its duty of care. A retail business breaches its duty to an invitee who slips on a foreign substance if "if the invitee establishes that (1) the substance was placed there by the negligence of the business; (2) the business had actual notice of the substance; or (3) the substance was there a sufficient length of time so that, in the exercise of ordinary care, its presence should have been discovered, *i.e.*, the business had constructive notice of the substance." *Zuppardi*, 770 F.3d at 649; see also *Pavlik*, 753 N.E.2d at 1063; *Lane*, 184 F.3d at 707. Here, Plaintiff argues that Defendant had both *actual* and *constructive* notice of the spilled water that caused Plaintiff's fall. The Court addresses each argument in turn.

### A. Actual Notice

Plaintiff has two theories regarding actual notice: (1) because the spill was caught on the store's surveillance footage, one of the camera operators had actual notice of the spill, and (2) because the unknown woman who spilled the water did not reappear with a Target employee for approximately 16 minutes, she likely gave notice to a Target employee during that interval.

#### 1. Actual Notice: Unknown Camera Operator

As to the former theory, Plaintiff says affirmatively that "[t]here is no question Mr. Nicholas or another Target security officer was operating the camera and watching the video surveillance at the time of the customer's spill and therefore there is a question of material fact with respect to whether Target had actual notice of the condition." [52, at 7.] The Court is not persuaded. Plaintiff cannot create a material issue of disputed fact by relying on speculation and assumption without providing any *reasonable* inferences supported by evidence in the record indicating that Defendant was on actual notice of the spill. See *Herzog v. Graphic Packaging Inter., Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) ("While [plaintiff] is entitled, as the nonmoving party, to all reasonable inferences in her favor, 'inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.'" (quoting *Tubergen v. St. Vincent Hosp. & Health Care Center, Inc.*, 517 F.3d 470, 473 (7th Cir. 2008))); *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2012) (explaining that non-movant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial" in order to defeat a motion for summary judgment).

Plaintiff's first speculative assumption is that either Mr. Nicholas "or another Target security officer" was "operating" (*i.e.*, manually controlling) the camera in question at the time of the spill. Mr. Nicholas testified at his deposition that had no recollection of whether he was

7

operating that camera—which is one of multiple cameras at this Target store—on the day of the spill, and the parties did not offer any testimony or evidence regarding any other Target security officers who might have been doing so. But more importantly, the camera in question was in a stationary position at the time of the spill, and there is nothing in the video footage (*e.g.*, zooming in or out, panning from side to side, etc.) that would indicate that *anyone* was operating the camera when the spill occurred. By contrast, it *is* apparent that someone was maneuvering the camera in question just *before* the spill (*i.e.*, the surveillance footage shows the camera departing from its default position for approximately 80 seconds and zooming in on a check-out lane before returning to its default position just before the spill). But the spill occurred *after* the camera returned to its default, stationary position. Because the camera in question was in its default, stationary position at the time of the spill, the reasonable inference is that nobody was "operating" the camera at that moment. Plaintiff's assertion that a security officer was operating the camera in question at the time of the spill thus is both speculative and belied by the video footage itself.

Somewhat relatedly, Plaintiff's second assumption is that one of Target's security officers was "watching" the live feed of the surveillance footage when the spill occurred. But again, Mr. Nicholas testified that Target has multiple cameras, including ones aimed at each cash register, and he has no recollection of watching this particular video feed at the time of the spill. It is mere speculation, then, to say that either Target's two on-duty security officers was watching the live surveillance footage of this one particular security camera at that particular moment. Were this level of speculation sufficient to create a material issue of fact as to actual notice, then plaintiffs could create a triable issue anytime a third-party spill is caught on a surveillance camera, arguing the possibility that *someone* could have seen it happen. The only

security officer that Plaintiff deposed testified that had no recollection of whether he was watching the surveillance footage that depicted the spill, and the mere possibility that one of the security officers was watching the live surveillance footage in question is not enough to overcome a motion for summary judgment. See *Herzog*, 742 F.3d at 806.

Plaintiff then links two more speculative assumptions onto its chain of supposed inferences: that the unknown Target security officer who allegedly watched the live surveillance feed (a) was focused on the specific customer who caused the spill, and (b) noticed that a spill actually occurred. As to the former, the surveillance camera's default position covers a large corner of the Target store, which includes the electronics area, the "softlines" clothing and accessories area, the Dollar Spot aisles, and two self-check-out lanes. In addition, the video footage shows the camera returning to its default position at 2:15:40 p.m., and the spill occurs just *four seconds later*, at 2:15:44 p.m. At that time, there are no fewer than eight customers visible on the camera. Thus, even assuming that a security officer was watching the live footage from that particular camera, it is highly speculative to assume that he or she would have been watching the one customer in question, as opposed to the many other customers visible on the screen at the same time. And as to the latter, even if one focuses on the female customer who dropped the cup, the only reasonable inference is that the customer dropped *something* onto the floor. There is a large partition wall that divides the Dollar Spot section from the self-check-out lanes, and the entirety of the spill is blocked by that partition wall. Only the customer's upper torso is visible from the video footage, and when she bends down to pick up the dropped item, both she *and the spill* are hidden from view—*i.e.*, the spill itself *is not visible* on the surveillance footage. Further, there are two other customers in the aisle at the time of the spill, and approximately 12 customers who walked past the spill in 16 minutes following the spill, and

there are no indications from any of those customers that might have indicated to the security officers that a spill had occurred (*e.g.*, no slipping, no staring at the ground where the spill occurred, no stepping over a puddle, no offering assistance to the spiller, no trying to clean the spill, no searching for an employee, etc.). See *Fultz v. Target Corp.*, 2016 WL 374141, at *5 (N.D. Ill. Feb. 1, 2016) (no actual knowledge of a slippery floor at a Target store where surveillance video showed "over twenty people walking through the area of [plaintiff's] fall in the minutes before and after the fall without slipping and without any apparent difficulty"). Similarly, the woman who dropped the cup can be seen emerging from the Dollar Spot section shortly after the spill, pushing her cart in an ordinary fashion, not appearing to be in any rush or on the lookout for any Target employees. In short, there is nothing on the video that would give even an attentive security officer actual notice that a spill had occurred.

In conclusion, there is no evidence, disputed or otherwise, that any Target security officer saw the spilled water or otherwise knew that a spill had occurred. Plaintiff relies solely on speculation and assumption in arguing to the contrary, which is insufficient to defeat a motion for summary judgment. See, *e.g.*, *Byrd-Tolson v. Supervalu, Inc.*, 500 F. Supp. 2d 962, 971 (N.D. Ill. 2007) ("[A]ctual notice cannot be found where '[t]here is no evidence that defendant or any of its employees were responsible for or knew of the existence of a foreign substance[.]'" (quoting *Erkol v. Marshall Field & Co.*, 1989 WL 18248, at *2 (N.D. Ill. Mar. 1, 1989))).[2]

---

[2] In cases where plaintiffs successfully prevented defendants from obtaining summary judgment on actual-notice claims, the evidence presented was far less speculative than what Plaintiff has presented here. See, *e.g.*, *Miller v. TFI Friday's, Inc.*, 2007 WL 723426, at *3–4 (N.D. Ill. Mar. 5, 2007) (hostesses post-fall statement to the plaintiff that store employees "should have cleaned up the stair" was sufficient to create a triable issue of fact as to whether the hostess had actual knowledge of the hazard pre-fall); *Pavlik*, 753 N.E.2d at 1010–12 (employee's post-occurrence comment that "oh, she was supposed to clean that up and she didn't," created a triable issue of fact as to actual notice).

10

## 2. Actual Notice: Unknown Target Employee

Plaintiff's second "actual notice" argument is even more speculative than her first, arguing that because the spiller disappeared for approximately 15 minutes before returning with Mr. Terzic, she must have informed a Target employee of the spill during that time. Because the identity of the spiller (an unknown female customer) is unknown, the parties were unable to question her as to what she did during this 15-minute interval. The only admissible evidence presented on this issue is (a) the surveillance footage and (b) Mr. Terzic's testimony.

As to the former, the surveillance footage does not depict the spiller looking for or otherwise communicating with any Target employees. To the contrary, it shows the spiller emerging from the Dollar Spot section with her shopping cart, not appearing to be in any rush or on the lookout for any Target employees. The spiller then proceeds toward the front of the Target store, at which point she disappears from the view of the camera for approximately 90 seconds. Plaintiff argues that during this 90-second interval, "[i]t could be reasonably inferred [that the unknown customer] reported the spill to someone else who did not respond." [52, at 7.] Similarly, the parties are unaware as to what the unknown woman did for the remainder of the 16-minute interval before she returned to the spill site with Mr. Terzic. Plaintiff argues that "[i]t just wouldn't make sense for the customer to first notify a Target employee of a spill of water 16 minutes after it was spilled," [52, at 7], implying again that the woman must have given actual notice to a Target employee during this interval. These inferences are speculative.[3] The Court is obligated to resolve all reasonable inferences in Plaintiff's favor, but "inferences that are

---

[3] Defendant argues that the more reasonable inference is that the unknown woman went to the restrooms at the front of the store because she had just spilled water on herself (a fact that Plaintiff allegedly overheard when the unknown woman and Mr. Terzic arrived at the spill location). But the Court need not resolve where the unknown woman went for this 90-second period, or where she went for the subsequent 14 minutes before she and Mr. Terzic made their way to the spill location. The Court's only obligation is to determine whether Plaintiff has set forth specific facts showing that there is a triable issue here.

11

supported by only speculation or conjecture will not defeat a summary judgment motion." *Herzog*, 742 F.3d at 806. Plaintiff's assumptions about the unknown woman's off-camera whereabouts are conjecture and therefore insufficient to create a triable issue of fact as to whether Defendant had actual notice of the spill.

The only other admissible evidence regarding the unknown woman's actions comes from Target employee Muhamed Terzic, who testified in his deposition that after the unknown woman informed him of the spill, he followed Target's 60-Second Rule in responding to the spill notification. Thus, Mr. Terzic received actual notice of the spill from the unknown female customer, and he responded to that notice by accompanying the woman to the spill site immediately upon notification. Mr. Terzic's testimony does nothing to advance Plaintiff's argument that the unknown woman informed any other Target employee of the spill before she reported it to Mr. Terzic. If anything, the fact that the woman sought out Mr. Terzic tends to negate any suggestion that she informed another Target employee, as it seems doubtful that the woman would have alerted two different Target employees of the same spill.

Plaintiff also argues that "there is evidence Plaintiff overheard the customer say she had told someone else from Target about the spill." [52, at 7.] While, if admissible, this statement would create a triable issue of fact as to whether Target was on actual notice of the spill, the statement is inadmissible hearsay and thus cannot provide the basis for avoiding summary judgment. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment."). What the unknown woman said to Plaintiff (or what Plaintiff overheard her saying) is an out-of-court statement being offered for the truth of the matter asserted (*i.e.*, that she told someone else from Target about the spill), and is therefore hearsay. Fed. R. Evid. 801. While Plaintiff avoids the hearsay argument

12

altogether, Defendant rightly notes that "[e]vidence that is 'used only to show notice' is not hearsay," and thus can be used to oppose summary judgment. *Harden v. Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 861 (7th Cir. 2015) (quoting *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 518 F.3d 459, 468 (7th Cir. 2008)). The argument is that this out-of-court statement is being offered to show that Target was on notice of the spill, and therefore the statement is not hearsay. However, the "notice" exclusion only applies if "the significance of [the] offered statement lies solely in the fact that it was made" and if "no issue is raised as to the truth of anything asserted." Fed. R. Evid. 801(c), advisory committee's note. The statement in question here—the unknown woman saying to Mr. Terzic and/or Plaintiff that she told someone about the spill—*does* raise an issue regarding the truth of the statement: did the unknown woman tell someone else about the spill?[4] The statement therefore is inadmissible hearsay.

**B. Constructive Notice**

Plaintiff also argues that Defendant had constructive notice of the spilled water. Constructive notice can be established under Illinois law by either presenting evidence that "(1) the dangerous condition existed for a sufficient amount of time so that it would have been discovered by the exercise of ordinary care, or (2) the dangerous condition was part of a pattern of conduct or a recurring incident." *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 651 (7th Cir. 2014) (citing *Culli v. Marathon Petroleum Co.*, 862 F.2d 119, 123 (7th Cir. 1988) (citing Illinois cases)). Plaintiff relies on the first element, arguing that the 16 minutes and 22 seconds

---

[4] To be clear, the unknown woman's statement is double hearsay (*i.e.*, hearsay within hearsay). The first out-of-court statement occurred when the unknown woman allegedly provided notice of the spill to a Target employee. The second out-of-court statement is the unknown woman's recounting of her first statement to Mr. Terzic and/or Plaintiff at the spill site. While the unknown woman's first statement arguably is not hearsay (*i.e.*, her statement to a Target employee that she spilled something shows that the Target employee was on notice of a spill, regardless of the truth of whether a spill actually occurred), the unknown woman's second statement—which is the only statement relevant for purposes of this motion—*is* being offered for the truth of the matter asserted and thus is inadmissible hearsay.

that the spill went unnoticed is a sufficient amount of time to create a triable issue of fact regarding constructive notice.

The Seventh Circuit has observed that "Illinois law recognizes that there is no bright-line rule indicating the requisite time to establish notice, though periods in excess of ten minutes have failed the test." *Reid v. Kohl's Dep't Stores, Inc.*, 545 F.3d 479, 483 (7th Cir. 2008) (concluding that "[u]nder the circumstances of this case, no reasonable person could conclude that ten minutes was enough time to give Kohl's constructive notice of the spilled substance"). Instead, Illinois courts have adopted a case-by-case approach that examines both the length of time the spill existed and the surrounding circumstances. *Reid*, 545 F.3d at 843; *Peterson*, 241 F.3d at 605. Relevant "surrounding circumstances" can include the area where the spill occurred, the time the spill occurred, the visibility of the spill, the store's policies on patrolling its aisles for spills,[5] etc.—with the critical question in all instances being "whether the substance that caused the accident was there a length of time so that in the exercise of ordinary care its presence should have been discovered.'" *Reid*, 545 F.3d at 481–82 (quoting *Torrez v. TGI Friday's, Inc.*, 509 F.3d 808, 811 (7th Cir. 2007)).

Illinois' totality-of-the-circumstances approach to assessing constructive notice has led to varying results. The benchmark case from the Illinois courts is *Hresil v. Sears, Roebuck & Co.*, 403 N.E.2d 678 (Ill. App. Ct. 1980), where the court held that the presence of a phlegm-like substance on the floor in the women's clothing department of an uncrowded self-service retail department store for 10 minutes, as a matter of law, did not amount to constructive notice. *Hresil*, 403 N.E.2d at 680. The Seventh Circuit relied on *Hresil* in affirming a grant of summary judgment in favor of a defendant department store on the issue of constructive notice. *Reid v.*

---

[5] To be clear, a business's internal policies do not create legal duties, see *Zuppardi*, 770 F.3d at 652, but courts nonetheless consider a business's policies and practices in assessing employee reasonableness. See *Peterson v. Wal-Mart Stores, Inc.*, 241 F.3d 603, 605(7th Cir. 2001).

*Kohl's Dep't Stores, Inc.*, 545 F.3d 481, 482–83 (7th Cir. 2008). In *Reid*, the Seventh Circuit reflected on the time element of a constructive notice claim, confirming that "Illinois law recognizes that there is no bright-line rule indicating the requisite time to establish notice," and citing *Hayes v. Bailey*, 400 N.E.2d 544, 546 (Ill. App. Ct. 1981), as an example where even a 30-minute delay was deemed insufficient to establish constructive notice. *Id.* Instead, the *Reid* court focused on "the specific circumstances of the case and conditions of the store at the time of the fall," ultimately holding that a pink milkshake, spilled on the floor of an uncrowded department store that did not sell milkshakes 10 minutes before a customer slipped on it, did not put the store on constructive notice of the spill. *Id.* at 483 ("Nothing in the district court's analysis of the constructive notice issue ran afoul of Illinois law."); see also *Pita v. Target Corp.*, 2009 WL 1507645, at *4–5 (N.D. Ill. May 29, 2009) (holding that 10 minutes was not a sufficient amount of time to establish constructive notice of a colorless, odorless liquid in a cosmetics aisle of a Target during a low-traffic time of day). The Seventh Circuit recently reprised its *Reid* analysis in *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644 (7th Cir. 2014), again rejecting any "bright-line rule designating the requisite time to establish constructive notice," and holding that a Wal-Mart did not have constructive notice of a colorless, odorless spill that went unnoticed for "a few minutes" on a day where Wal-Mart was not experiencing heavy traffic (even though the area in question was a high traffic area of the store), and where Wal-Mart employees were only trained "to be on the lookout for unsafe conditions, and to stay with any found spill until removed." *Id.* ("Considering these circumstances cumulatively, a few minutes was not enough time to give Wal-Mart constructive notice of the puddle.").

The main case on the other side—*i.e.*, where the court determined that there *was* a triable issue of fact regarding constructive notice—is *Peterson v. Wal-Mart Stores, Inc.*, 241 F.3d 603,

15

605 (7th Cir. 2001). In *Peterson*, the Seventh Circuit reversed a grant of summary judgment in favor of defendant on a constructive notice claim where a customer slipped on spilled shaving lotion that had been in an aisle for "at least ten minutes." *Id.* at 604. The court confirmed that the Illinois courts do not apply a bright-line 10-minute rule, noting that in certain instances "it is certainly arguable that ten minutes is too short a time to establish a storeowner's negligence in failing to have noticed and corrected a dangerous condition caused by a customer." *Id.* at 605 (citing cases). But the court ultimately concluded, based on the facts of that particular case, that "Wal-Mart hurt itself * * * by presenting evidence * * * that its employees patrol the aisles constantly for signs of spills," making the issue of constructive notice "a matter to be explored at trial." *Id.* Similarly, in *Holbrook v. Casey's General Stores, Inc.*, 2009 WL 2488297 (S.D. Ill. Aug. 13, 2009), the plaintiff slipped on melted ice next to a soda fountain in a convenience store that went unnoticed for 15 minutes. *Holbrook*, 2009 WL 2488297, at *3. In applying the aforementioned totality-of-the-circumstances test, the court observed that "[t]he risk of spills in the self-service food and drink area was substantial," and that the small size of the convenience store made it "less burdensome to patrol" than the large department stores at issue in *Hresil* and *Reid*, thus creating a triable issue on the "critical question" of whether the store should have known about the spill. *Id.* ("Because the risk of spills is higher and the burden of inspecting for them is lower in a convenience store than in a department store, cases like *Hresil* and *Reid* do not dictate the results in this case.").

The hazard in this case was created when an unidentified customer spilled a cup of water on the floor. The water, of course, was colorless and odorless. The size of the spill was described as small as a four-inch diameter circle and as large as a six-foot spill, but either way, the surveillance video shows several customers walking in the vicinity of the puddle of water

16

without looking down or otherwise altering their movements to avoid the spill, as might be expected had they noticed it. The spill occurred in the Dollar Spot section of the store, where Target sells traditional merchandise—not food or drinks. See, *e.g.*, *Geleta v. Meijer, Inc.*, 2013 WL 6797111, at *5 (N.D. Ill. Dec. 23, 2013) ("A business is not required to continuously patrol its floor and aisles on the lookout for spills, but it may be required to frequently and carefully patrol them, especially in areas where spills are likely. A bakery department, where the evidence reflects that individual bakery goods can be purchased and glazes and toppings are applied out on the floor (and not just in the kitchen), is such a place."). The spill occurred in June, and there is no evidence that it was raining that day or that there were any concerns of customers tracking water into the store. Plaintiff's fall occurred around 2:30 p.m. on a Thursday afternoon, and Mr. Terzic explained that the store was not "particularly crowded" at that time. See, *e.g.*, *Zuppardi*, 770 F.3d at 652 ("Because the record reflects that the store was not particularly busy, the duty to scrutinize the aisles consequently decreased."). Plaintiff says that regardless of how crowded it was, approximately a dozen "employees" (*i.e.*, people wearing red shirts and khaki pants, akin to the Target employee uniform) walked by the Dollar Spot area in the 16-minute interval without actually walking down the aisle with the spill. But while Target employees are instructed to look for spills and to respond to spills once they are identified (the so-called 60-Second Rule), there are no specific times of the day where Target employees are required to walk each area of the department store to patrol individual aisles. See *Zuppardi*, 770 F.3d at 652 ("Illinois courts have summarily rejected" any rule that would "require the continuous monitoring and patrolling of a store's safety conditions"); *Peterson*, 241 F.3d at 604 ("the duty of inspection and clean up does not require continuous patrolling of the aisles"); *Howard v. Wal–Mart Stores, Inc.*, 160 F.3d 358, 359 (7th Cir. 1998) (a business "is not required to patrol the

aisles continuously, but only at reasonable intervals"); *Hresil*, 403 N.E.2d at 680 (demanding a store to constantly patrol its aisles is an unfair requirement).

In short, as in *Hresil*, *Reid*, and *Zuppardi*, all of the "surrounding circumstances" here weigh in Defendant's favor: the colorless and odorless spill was not readily noticeable, "the store was not particularly busy,"[6] the Dollar Spot area was not a natural spot for a water hazard, etc. And unlike in *Peterson*, there is nothing here that "hurts" Defendant, such as the evidence in that case suggesting that Target's employees were on constant patrol of the aisles. See, *e.g.*, *Pita v. Target Corp.*, 2009 WL 1507645, at *5 (N.D. Ill. May 29, 2009) (granting summary judgment for defendant on the issue of constructive notice, noting that, "[i]n short, this case is more like *Reid* than *Peterson*"). The only factor that could possibly support the existence of a triable issue of fact is the length of time the spill went unnoticed: 16 minutes and 22 seconds. But Illinois courts have flatly rejected any bright-line 10-minute threshold and, as the Seventh Circuit has noted on several occasions, "periods in excess of ten minutes have failed the test" for what constitutes constructive notice. *Reid*, 545 F.3d at 483 (citing *Hayes*, 400 N.E.2d at 546 (noting that a 30-minute delay would be insufficient to establish constructive notice)); *Zuppardi*, 770 F.3d at 651–52 (same). The Court concludes that under the circumstances of this case, the presence of water on the floor of the Dollar Spot area for 16 minutes and 22 seconds is insufficient to permit a reasonable jury to find that Target had constructive notice of the spill. Accordingly, Defendant's motion must be granted.

### C. Open and Obvious

In its reply brief, Defendant argues in the alternative that if Plaintiff's description of the spill as a four- or six-foot puddle of water were accepted as true, then the spill constitutes an

---

[6] *Zuppardi*, 770 F.3d at 652; see also *Alexander v. Supervalu Inc.*, 2015 WL 7351693, at *6–7 (N.D. Ill. Nov. 20, 2015) (granting summary judgment for defendant in a slip-and-fall case, taking into consideration the fact that "the store was not crowded at the time of the incident").

18

"open and obvious" condition that Plaintiff should have observed prior to her fall. Under Illinois law, "persons who own, occupy, or control and maintain land are not ordinarily required to foresee and protect against injuries from potentially dangerous conditions that are open and obvious." *Buchaklian v. Lake County Family YMCA*, 732 N.E.2d 596, 600 (Ill. App. Ct.2000) (citing *Bucheleres v. Chicago Park District*, 665 N.E.2d 826 (Ill. 1996)); see *Ward v. K-Mart Corp.*, 554 N.E.2d 223, 230 (Ill. 1990) ("Certainly a condition may be so blatantly obvious and in such position on the defendant's premises that he could not reasonably be expected to anticipate that people will fail to protect themselves from any danger posed by the condition."). "For a condition to be open and obvious, an invitee must reasonably be expected to discover it and protect himself against it." *Buchaklian*, 732 N.E.2d at 600 (citing *Deibert v. Bauer Bros. Constr. Co.*, 566 N.E.2d 239 (Ill. 1990) and Restatement (Second) of Torts § 343A cmt. b, at 219 (1965)). "[T]he issue of whether a condition is obvious is determined by the objective knowledge of a reasonable person, not the plaintiff's subjective knowledge." *Id.* at 602 (citation omitted).

Here, the Court cannot find as a matter of law that the substance was open and obvious. In addition to the conflicting evidence regarding the size of the puddle (*i.e.*, anywhere from a four-inch diameter circle to a six-foot puddle), the undisputed evidence shows that the puddle was clear and odorless, and that numerous individuals walked past the spill without appearing to notice it. Indeed, where (as here) a plaintiff fails to notice a condition prior to slipping or tripping, courts consistently have found the open and obvious issue to be a question of fact. See, *e.g.*, *Geleta*, 2013 WL 6797111, at *6 (denying summary judgment and genuine dispute existed as to whether a brown substance on the floor of the bakery that the patron did not see prior to her fall was an open and obvious condition); *Hamilton v. Target Corp.*, 2013 WL 6050441, at *3 (N.D. Ill. Nov. 15, 2013) (same, with a puddle of water); *Ward v. KFC Corp.*, 2009 WL 497902,

at *2, n.1 (N.D. Ill. Feb. 25, 2009) (same, with a puddle of water); *Buchaklian*, 732 N.E.2d at 601–02 ("We determine in this case that, where plaintiff was an invitee and had to walk over a mat in order to utilize the YMCA pool facilities, and where plaintiff may not have seen a defect in the mat before she tripped, genuine issues of material fact exist as to whether the defect in the mat was an open and obvious danger that plaintiff should have seen."). Yet, because the Court has already concluded that Defendant is entitled to summary judgment, this determination regarding whether the hazard was an "open and obvious" condition does not impact the outcome of this case.

**IV.　Conclusion**

For the foregoing reasons, Defendant's motion for summary judgment [36] is granted. Judgment will be entered against Plaintiff and in favor of Defendant.

Dated: March 23, 2016

　　　　　　　　　　　　　　　　　　　　　Robert M. Dow, Jr.
　　　　　　　　　　　　　　　　　　　　　United States District Judge